(No. 5702.  December 8, 1931.)

ALLAN RAMSAY, Appellant, v. SULLIVAN MINING COMPANY, Respondent.

[6 Pac. (2d) 856.]

Elmer E. Johnston, for Appellant.

James E. Gyde and James E. Gyde, Jr., for Respondent.

BUDGE, J.—This appeal is taken from a judgment of the district court affirming an order of the Industrial Accident Board denying appellant's claim for compensation against respondent on account of injuries sustained while in its employ resulting in total disability.

The material facts concerning the injuries sustained by appellant for which he seeks compensation, as disclosed by the testimony taken upon the hearing before the Industrial Accident Board are substantially as follows:

Appellant, a single man, forty-five years of age, had followed his occupation as carpenter for twenty years prior to September 27, 1927, when he entered the employ of

respondent in that capacity at its zinc plant at Kellogg. Except for an attack of typhoid fever about 1909 from which he fully recovered in a few months and except as hereinafter related, appellant has always enjoyed good health. In November, 1928, the construction of respondent's zinc plant by contractors was practically completed and as respondent desired to have one of its own employees familiar with the process known as "lead burning" in order to make necessary repairs to the cells and tanks in said plant, appellant was selected for such work and was instructed and commenced work as a "lead burner" in the latter part of November, 1928. The cells referred to were about 4½ feet deep, 7 feet long and 4 feet wide and the tanks were about 15 feet deep, cylindrical, and from 15 to 30 feet in diameter. These cells and tanks were being lined with lead and it was the duty of the lead burner to weld the sheets of lead lining the sides thereof by melting the edges of the adjoining sheets by the use of an oxyhydrogen torch. The sheets of lead forming the bottom of the cells and tanks were welded together by means of an oxyhydrogen torch by melting strips of lead from ⅜" to ⅝" in diameter along the joints. In welding the bottom of the cells and tanks it is necessary for the lead burner to get his face quite close to the melting lead and torch to carefully watch the welding and to avoid melting holes in the sheets of lead being welded. No respirator or mask was furnished or used by the lead burners. Appellant testified that during welding operations the air in the cells and tanks became quite suffocating and that he had to get out of the tank in which he was working as many as six times a day to get fresh air, and that after he had been working as a lead burner for about three weeks he began to grow nervous and to experience pains in the lower bowels, became extremely constipated and had frequent belchings which continued until December 22, 1928. On that day appellant was engaged in welding the bottom of a tank and had been working in a stooping position for several hours. He then started to straighten up and immediately sank to the floor in a fainting condition and the next thing

he knew someone was helping him to a standing position, and he was then assisted to and put into an automobile of respondent's and taken to Dr. Kennett at the Wardner Hospital accompanied only by the driver of the car. While appellant was being assisted from the tank to the automobile he informed the outside foreman that previous to that time he had had a similar attack and on that occasion had dropped and then sat down a few minutes and got up and went on. At the hospital Dr. Kennett talked to appellant not over two minutes, made no examination and told him he did not think it was very serious and for him to go back to the plant. When appellant arrived at the plant he was very dizzy, sick at his stomach and extremely nervous. At the suggestion of his foreman he went to Spokane to consult a doctor and stayed there for three days but did not see a doctor as he was afraid to cross the street on account of his physical condition. He then went to his home in Stevens county, Washington, remaining there but one day and then returned to Kellogg intending to go to work the following morning but the following morning he felt in worse condition than ever before. His foreman came to see him, advised him to go to the hospital and furnished an automobile and appellant was conveyed to the Wardner Hospital where he remained from about January 1, 1929, until April 15, 1929, where he was given an anti-syphilitic treatment. While in the hospital the pain in his bowels and left foot and his nervousness continued and after being so treated for six weeks his left arm became affected and partially paralyzed. Appellant was sent to the Deaconess Hospital in Spokane, Washington, during Easter week of 1929, and remained there for four days under observation and was examined and discharged without treatment. He then returned to a rooming-house in Kellogg and remained there until August 15, 1929. Evidence was also introduced showing his physical condition to be as found by the board and as hereinafter recited and showing expenditures for medical and hospital services.

Findings of fact substantially in accordance with the foregoing were made by the board, including the following:

"That claimant is not now, and never has been, suffering with syphilis.

"That claimant is now suffering with hemiplegia, has contracted muscles of the left arm due to a nervous trouble causing contraction of the extensor muscles, weakness of the left leg, and some atrophy caused by a nerve lesion, and that said condition is the result of lead poisoning; that the lead poisoning which resulted in claimant's condition was contracted by claimant while working for the defendant, Sullivan Mining Company, as a 'lead burner' and is the result of his handling and welding the sheet lead for lining the tanks and cells in defendant's plant.

"That the claimant now is, and ever since the 22nd day of December, 1928, has been, totally disabled for work, and that the said disability for work is due to his physical condition above described."

From such findings the board concluded as a matter of law that appellant did not sustain a personal injury by accident arising out of and in the course of his employment with respondent, and entered its award denying compensation and dismissing appellant's application.

Upon appeal to the district court from such award judgment was entered affirming the same, from which judgment this appeal is taken.

Appellant relies upon six assignments of error, all of which, with the exception of the last, relate to and involve the same question, namely: That the trial court erred in entering its judgment adopting and affirming the findings, conclusions and award made by the Industrial Accident Board for the reason that the same are not warranted by the evidence and are contrary to law. It is stated in appellant's brief that "the whole question presented is one of law as to whether, under the facts and findings, this case is an accident or an occupational disease."

At the outset it should be observed, as stated in *McNeil v. Panhandle Lumber Co.,* 34 Ida. 773, 786, 203 Pac. 1068, 1073:

"The workmen's compensation law, like other laws of this state, is to be liberally construed with a view to effect its object and promote justice. (C. S., sec. 9444; *Fidelity & Casualty Co. of N. Y. v. Industrial Acc. Com.*, 177 Cal. 614, 171 Pac. 429, 430, L. R. A. 1918F, 856.) This does not mean that the courts should endeavor by construction to extend its provisions to persons not intended to be included by it, but that it shall be so construed as to carry out its purposes and, so far as is reasonably possible, secure its benefits to all those who were intended to receive them."

It is strenuously urged by respondent that appellant's condition was not the result of lead poisoning but if found to be the result of lead poisoning that it was an occupational disease and not compensable under the Workmen's Compensation Act. Upon the question of whether, by inhaling the oxides from the lead he was welding, which entered his system by absorption or otherwise, appellant suffered from lead poisoning as a result thereof, there is a direct conflict in the evidence. Some witnesses testified positively that appellant's condition was due to lead poisoning while other expert witnesses testified with equal positiveness that his condition was not due to lead poisoning. The rule would seem to be that in reviewing hearings had before the Industrial Accident Board upon the question as to whether the evidence submitted sustained the findings of the board the court will consider the competency, relevancy and materiality of the evidence according to the rules applicable to trials in courts. The findings of fact of the Industrial Accident Board, when supported by competent evidence are conclusive upon appeal to the district court or this court, the jurisdiction of said courts being limited to a review of questions of law and the rule is well settled which forbids this court to reverse the trial court in cases where the evidence is conflicting but sufficient, if uncontradicted, to sustain the decision, and applies to findings of fact made by the Industrial Accident Board and is applicable likewise to the district court in reviewing the decision of said board. (*Ybaibarriaga v. Farmer*, 39 Ida. 361, 228 Pac. 227; *Delich v. Lafferty Shingle Mill Co.*, 49 Ida. 552, 290 Pac. 204.)

We cannot say from the record before us that there is not sufficient competent evidence to sustain the board's finding to the effect that appellant's injuries were the result of lead poisoning which resulted in appellant's condition and were contracted by appellant while working for respondent as a lead burner and are the result of his handling and welding sheet lead for lining the tanks and cells in respondent's plant.

If the injury was the result of lead poisoning, under the peculiar circumstances of this case we are of the opinion that it was a personal injury by accident arising out of and in the course of employment within the meaning of C. S., secs. 6217 and 6323, as amended (1927 Laws, chap. 106, pp. 136, 148), and compensable, it being conceded that an occupational disease is not compensable under the workmen's compensation laws of this state.

In the case of *McNeil v. Panhandle Lumber Co., supra,* with reference to the definition of the word "accident" this court said:

"Webster's New International Dictionary defines the word 'accident' as follows: 'An event that takes place without one's foresight or expectation; an undesigned, sudden, unexpected event; an undersigned and unforeseen occurrence of an afflictive or unfortunate character.'

The New Standard Dictionary gives the following definition: 'Anything that happens; anything occurring unexpectedly, or without known or assignable cause.'

'The word "accident" as used in the Compensation act requiring the injury compensated for to be by "accident" is held to be employed in its ordinary sense as meaning an unlooked for and untoward event which is not expected or designed.' (Corpus Juris, Workmen's Compensation Acts, p. 64.)

In the case of *Fenton v. Thorley,* L. R. App. Cas. (1903) 443, it is said 'that the expression "accident" is used in the popular and ordinary sense of the word as denoting an unlooked for mishap or an untoward event which is not expected or designed.' "

To the same effect see 1 Honnold, Workmen's Compensation, 274. The evidence shows that the oxides of lead being absorbed into the body of appellant brought about a result in a few weeks which, according to the testimony of physicians called by appellant and respondent would usually take a period of months or possibly years and, as to time, it was not the customary or natural result that follows the absorption of lead oxides into the system. Therein lies the distinction between an occupational disease and an injury by accident.

"An occupation or industry disease is one which arises from causes incident to the profession or labor of the party's occupation or calling. It has its origin in the inherent nature or mode of work of the profession or industry, and it is the usual result or concomitant. If, therefore, a disease is not a customary or natural result of the profession or industry, *per se,* but is the consequence of some extrinsic condition or independent agency, the disease or injury cannot be computed to the occupation or industry, and is in no accurate sense an occupation or industry disease." (*Victory Sparkler & Specialty Co. v. Francks,* 147 Md. 368, 44 A. L. R. 363, 128 Atl. 635.)

In the course of the opinion in *Carroll v. Industrial Com. of Colorado,* 69 Colo. 473, 19 A. L. R. 107, 195 Pac. 1097, 1098, the court quotes with approval from 25 Harvard Law Review, 340, as follows:

"Since the case of *Fenton v. Thorley,* nothing more is required than that the harm that the plaintiff has sustained shall be unexpected. . . . . It is enough that the causes, themselves known and usual, should produce a result which on a particular occasion is neither designed nor expected. The test as to whether an injury is unexpected, and so, if received on a single occasion, occurs 'by accident,' is that the sufferer did not intend or expect that injury would on that particular occasion result from what he was doing."

In *Sullivan Min. Co. v. Aschenbach,* 33 Fed. (2d) 1, 3, the circuit court of appeals, speaking through the late Judge Dietrich, said:

"In common understanding we think plaintiff's injury would be regarded and spoken of as accidental, or, in more technical language, as 'an unlooked for mishap or an untoward event which was not expected or designed.' Nor do we think the injury was in any real sense an occupational disease. It was more in the nature of an acute case of poisoning. Had appellee suffered an impairment of health as the gradual result of breathing fumes from paints in common use and of working under ordinary conditions, that would be classed as an occupational disease. But here his disability resulted unexpectedly and suddenly from an unusual agency. Hazard from its use was not a common incident of a painter's occupation, but was fortuitous. The distinction between such a case and an occupational disease is clearly recognized in *Mauchline v. State Insurance Fund*, 279 Pa. 524, 124 Atl. 168; *Industrial Commission of Ohio v. Roth*, 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463; *Victory Sparkler & Specialty Co. v. Francks*, 147 Md. 368, 128 Atl. 635, 44 A. L. R. 363; and *Moore v. Service Motor Truck Co.*, 80 Ind. App. 668, 142 N. E. 19, 20. . . . . Decisions in great number from other states have been collected in the briefs, particularly in appellee's brief; but we think that no useful purpose would be subserved by an attempt to review them. They exhibit much diversity, some of which may be accounted for by differences of fact or in statutory provisions. For example, a requirement that to be compensable the injury must result from 'violent or external means,' as in Oregon, or that the disability must result from a traumatic injury, as in Kentucky, would seem to present a materially different case. So where, as in Massachusetts and some other states, the word 'accident' is not used but only 'injury,' the law is more susceptible to differing interpretations. Undoubtedly the diversity cannot all be explained by either differences in statutory provisions or in point of fact and must to some extent be attributed to a difference of general judicial attitude. This condition is recognized by the Supreme Court of Idaho, and we think that it has unequivocally indicated that it stands with those courts which have taken the more liberal view of the law and given to it a broader

meaning, and to its views we must defer. That such an attitude is not exceptional or without basis of reason, see, in addition to cases already cited, *Carroll v. Industrial Commission of Colo.,* 69 Colo. 473, 195 P. 1097, 19 A. L. R. 107; *Matthiessen etc. Co. v. Industrial Board,* 284 Ill. 378, 120 N. E. 249; *Fidelity & Casualty Co. v. Industrial Board,* 177 Cal. 614, 171 P. 429 [L. R. A. 1918F, 856]; *Dove v. Alpena Hide etc. Co.,* 198 Mich. 132, 164 N. W. 253; *Van Fleet v. Public Service, etc.,* 111 Neb. 51, 195 N. W. 467; *Tintic Milling Co. v. Industrial Commission,* 60 Utah, 14, 206 P. 278, 23 A. L. R. 325; *New Marissa Coal Co. v. Industrial Commission,* 326 Ill. 116, 157 N. E. 32; *Houston Packing Co. v. Mason,* (Tex. Civ. App.) 286 S. W. 862; *United States Fidelity & Guaranty Co. v. Industrial Commission,* 76 Colo. 241, 230 P. 624; and even under the restrictive language of the Oregon law, *Dondeneau v. State Industrial Accident Commission,* 119 Or. 357, 249 P. 820, 50 A. L. R. 1129.''

As in the case last quoted from we do not think that the injury was in any sense an occupational disease but it was more in the nature of an acute case of poisoning. Neither the appellant nor the respondent anticipated such a result. It was wholly unexpected, unusual and unlooked for and therefore accidental. There was evidence given by physicians called as experts that appellant's condition may have been the result of some other cause than lead poisoning or syphilis, and if so it would come within the definition of the New Standard Dictionary, quoted above, namely: ''anything occurring unexpectedly, or without known or assignable cause.''

Appellant did not knowingly submit himself to the hazards of the work he was doing. He had no experience or information as to the danger of his work and neither did respondent. If respondent had known and appellant had realized the result that might follow the performing of the labor by appellant he would have been furnished with a respirator or mask, a simple remedy or prevention that would have avoided the accident and saved him from his present

unfortunate condition. As said in *Victory Sparkler & Specialty Co. v. Francks, supra*:

"It was by chance that employer did not use due care, and by chance that the vapor of phosphorous was where its noxious foreign particles could be inhaled by the girl. It was by chance that the inspired air carried these particles into her system, sickening her, and causing a necrosis of the jaw after fortuitously finding a lesion. The injury thus inflicted upon her body was 'accidental' by every test of the word, and its accidental nature is not lost by calling the consequential results a disease."

We are therefore unable to agree with the conclusions of law drawn from the findings by the board that appellant did not sustain a personal injury by accident arising out of and in the course of his employment with respondent. The injury was caused by accident and was not an occupational disease and is therefore compensable.

In view of the disposition made of this case it becomes unnecessary to discuss the last assignment of error which concerns the failure to allow hospital and medical expenses incurred by appellant.

The judgment of the district court is therefore reversed and the cause remanded, with instructions to direct the Industrial Accident Board to modify its conclusions and award in accordance with the views expressed herein and award appellant compensation for total disability and medical and hospital expenses. Costs awarded to appellant.

Lee, C. J., and Givens and Varian, JJ., concur.

McNAUGHTON, J., Dissenting.—The case is a difficult one but I am unable to concur with the majority opinion because, as I understand the law, an injury to be compensable must be the result of an accident arising out of and in the course of the employment. Here, granting that claimant's condition was unexpected and that it arose out of and in the course of the employment, it seems to me that the element of accident as a cause is lacking. The ailment, if not an

industrial disease, was nevertheless more in the nature of a result of the employment than an accident in the employment.

Petition for rehearing denied.